SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

### GMAC Mortgage, LLC v. TamiLynn Willoughby (A-97-15) (076006)

**Argued March 21, 2017 -- Decided July 31, 2017**

**ALBIN, J., writing for the Court.**

In this appeal, the Court determines whether a loan modification agreement, entered into through the medium of the Judiciary's Residential Mortgage Foreclosure Mediation Program, was a permanent or provisional agreement.

In February 2006, defendant TamiLynn Willoughby obtained a mortgage from plaintiff GMAC Mortgage, LLC (GMAC), which she defaulted on in June 2006. GMAC filed a foreclosure complaint and obtained a final judgment, and a Sheriff's sale of the property was scheduled for September 2009. The chancery court granted Willoughby's motion to stay the sale and permitted the parties to participate in New Jersey's Residential Mortgage Foreclosure Mediation Program, which was implemented by this Court in response to the economic crisis that resulted from the collapse of the housing market. The Program was intended to provide a neutral forum where parties could attempt to reach mutually agreeable terms for restructuring loans in order to avoid foreclosures and bring finality to disputes.

In May 2010, Willoughby and GMAC reached an agreement, which was memorialized in a "Foreclosure Mediation Settlement Memorandum," a form document provided by the Judiciary. GMAC's attorney handwrote the terms of the Agreement into the blank section of the memorandum, including that Willoughby was "being offered a trial to permanent modification plan contingent on signed modification documents and an initial down payment." Per the terms of the Agreement, Willoughby would pay a $6000 down payment by June 7, 2010, followed by monthly payments of $1678.48. In the event all trial payments were made, GMAC agreed to "make modification permanent," but if Willoughby missed any payments, it would continue with the foreclosure. The parties agreed that the Agreement was "final, binding and enforceable[.]" The mediator then filed a "Foreclosure Mediation Completion Report," checking off that the Agreement was a "Provisional Settlement – No Need to Reschedule Mediation (Case Not Dismissed)" and "Loan Modification."

Willoughby paid the down payment and proceeded to make monthly payments of $1678.48 through June 1, 2011. On June 7, 2011, GMAC's loan servicing agent sent Willoughby a new loan modification agreement with different terms, including increased monthly payments of $1814.52. Willoughby did not sign the new agreement, but began making the increased payments. In December 2011 and May 2012, Willoughby received two more modification agreements with slightly different terms, which she did not accept. On August 20, 2012, GMAC returned her monthly payment and advised that the loan would be referred to foreclosure because she failed to sign the May 2012 agreement. Willoughby had made $58,790.69 in payments under the May 2010 Agreement.

Willoughby moved to enforce the May 2010 Loan Modification Agreement. The chancery court ordered the parties to return to mediation, where GMAC offered a "Provisional Settlement Agreement" with new terms, including a $3630 down payment and monthly payments of $1805. Willoughby paid the down payment and verbally indicated that she accepted GMAC's terms, but she did not execute the loan modification documents and GMAC revoked the offer. The chancery court denied Willoughby's motion to enforce the May 2010 Agreement, finding that it was a "provisional settlement" as evidenced by Willoughby's submission to subsequent mediation sessions. On November 4, 2013, her home was sold to GMAC at a Sheriff's sale for $100.

In an unpublished opinion, the Appellate Division affirmed the chancery court's determination that the May 2010 Agreement was unenforceable. The panel determined that, because Willoughby never signed a permanent modification agreement, the parties never achieved a meeting of the minds for an enforceable agreement. The Court granted Willoughby's petition for certification. 227 N.J. 146 (2016).

**HELD:** Willoughby satisfied all contingent terms of the May 2010 Agreement, rendering the Agreement permanent and binding. Despite being compelled to engage in subsequent mediations and negotiations in an effort to save her

home, Willoughby did not voluntarily abandon the May 2010 Agreement.  The chancery court should have granted her pro se motion to enforce the Agreement as a permanent loan modification.

1.  At its core, this is a contractual dispute, and, like all such disputes, the language of the agreement typically governs.  In determining the meaning or validity of a contract, the Court's review is de novo.  It looks at the contract with fresh eyes, giving a faithful and logical reading to the words chosen by the parties to the agreement.  The issue here also implicates the Residential Mortgage Foreclosure Mediation Program, which mandates mediation in all cases in which homeowners, who occupy their residences, contest foreclosure actions.  The Program is intended to lead to amicably mediated resolutions and not endless rounds of mediation or litigation, goals which can only be met if the chancery courts enforce mediated settlements.  (pp. 13-16)

2.  The parties dispute whether the settlement was a provisional or permanent loan modification.  Under principles of contract law, a valid settlement agreement requires an "offer and acceptance," and terms that are sufficiently definite so that each party can, with reasonable certainty, ascertain the performance they must render.  Although the agreement here is not entirely free from ambiguity, the terms are sufficiently definite and detailed to indicate, with reasonable certainty, that the parties intended a permanent loan modification.  The Agreement stated that it was "a trial to permanent modification plan contingent" on signed documents and a down payment.  It also stated that, if Willoughby made all trial payments, it would become permanent.  Willoughby signed the documents, made the down payment, and made all the trial payments.  The Agreement has all of the indicia of a permanent and binding agreement, and Willoughby relied on a reasonable interpretation of it in making payments to save her home.  (pp. 16-19)

3.  Nothing in the Agreement suggested that, after twelve months, GMAC could unilaterally demand that Willoughby agree to a new loan modification on different terms or compel her to accept continued mediation sessions.  Although Willoughby began making increased monthly payments, apparently fearing that GMAC would restart the foreclosure action, she did not sign any of the new loan modification agreements, ultimately looking to the courts for protection.  When the chancery court did not enforce the Agreement and returned the case to mediation, the case went awry.  Although Willoughby was compelled to proceed with mediations and negotiations in an effort to save her home, the record establishes that she never voluntarily abandoned the May 2010 Agreement, having not signed the documents necessary to execute a contract superseding it.  (pp. 19-20)

4.  Through the medium of the Judiciary's Foreclosure Mediation Program, GMAC and Willoughby entered into a loan modification agreement, which provided that if Willoughby made all the trial payments, the Agreement would become permanent.  Willoughby carried out her part of the bargain.  The chancery court should have granted her pro se motion to enforce the agreement as a permanent loan modification.  Moreover, the Mediation Program Completion Report should provide a check-off category entitled "Final Settlement (Case Not Dismissed)" in order to make clear the type of agreement reached here where the final settlement was contingent on the homeowner's completion of trial payments and where compliance with those terms would result in dismissal of the foreclosure action.  (pp. 20-22)

5.  The Court remands to the chancery court to fashion, in its sound discretion, a suitable and equitable remedy.  If Willoughby's home was sold to a bona fide, good faith purchaser, she is not entitled to specific performance.  However, in the absence of specific performance, she is entitled to damages, if any, for breach of contract.  In performing that calculation, the chancery court may consider all relevant facts, including the payments made by Willoughby under the May 2010 Agreement, insurance proceeds GMAC received for damage caused to Willoughby's home during Hurricane Sandy, and the time Willoughby spent in her home without making monthly payments.  (pp. 22-23)

The judgment of the Appellate Division is **REVERSED**, and the matter is **REMANDED** to the chancery court for proceedings consistent with this opinion.

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in JUSTICE ALBIN's opinion.**

GMAC MORTGAGE, LLC,

    Plaintiff-Respondent,

          v.

TAMILYNN WILLOUGHBY,

    Defendant-Appellant.


Argued March 21, 2017 – Decided July 31, 2017

On certification to the Superior Court, Appellate Division.

Joshua W. Denbeaux argued the cause for appellant (Denbeaux & Denbeaux, attorneys).

Andrew P. Zacharda argued the cause for respondent (Tompkins, McGuire, Wachenfeld & Barry, attorneys).

Linda E. Fisher argued the cause for amici curiae Seton Hall Law Center for Social Justice, New Jersey Citizen Action, La Casa de Don Pedro, and the Housing and Community Development Network of New Jersey (Seton Hall University School of Law, Center for Social Justice, and Jurow & Schore, attorneys; Linda E. Fisher, Kevin B. Kelly, Rebecca Schore, and Margaret Lambe Jurow, on the briefs).


JUSTICE ALBIN delivered the opinion of the Court.

In November 2008, following the collapse of the housing market, this Court implemented a statewide Residential Mortgage Foreclosure Mediation Program to address the economic crisis

1

that left many of our citizens facing the loss of their homes. The primary goal of the Mediation Program was to provide a neutral forum where homeowners and lenders could attempt to reach mutually agreeable terms for restructuring loans to avoid foreclosures. The Program was intended to bring finality to disputes, not to be a springboard for endless rounds of mediation and litigation. This appeal illustrates one case that eluded the beneficent purposes of the Program.

After defaulting on her home loan with plaintiff GMAC Mortgage, LLC, defendant TamiLynn Willoughby entered into New Jersey's Foreclosure Mediation Program. The mediation process led to an agreement between GMAC and Willoughby that gave Willoughby a path to save her home through a "permanent modification" of the loan. The agreement, executed in 2010, set forth the required down payment and monthly payments, the unpaid principal balance, the amount in arrears, and the length and interest rate of the loan.

Willoughby complied with that agreement, paying the down payment and each monthly installment for one year. Then, GMAC began sending Willoughby proposals differing from the 2010 agreement, which GMAC claimed was provisional. Willoughby moved to enforce the 2010 settlement agreement, but instead the chancery court ordered additional mediation sessions. Willoughby never accepted in writing any of GMAC's proposals to

2

modify the original agreement. Protracted litigation ensued. Willoughby's efforts to enforce the 2010 settlement agreement proved fruitless, and GMAC's foreclosure action ended with a Sheriff's sale of Willoughby's home.

Willoughby was denied relief by the chancery court, which held that the 2010 mediation agreement was "provisional" and not enforceable as a final settlement agreement. The Appellate Division affirmed.

We now reverse and conclude that Willoughby and GMAC entered into an enforceable settlement agreement through the Foreclosure Mediation Program.

The language of the 2010 mediation agreement -- much of it handwritten by GMAC's attorney -- spoke of a "permanent modification" that was final and binding. The specificity of the terms, including the length of the mortgage, did not suggest that the agreement was a temporary placeholder awaiting a final resolution. The 2010 mediation agreement was worded as a final settlement, not a prelude to further negotiations. Willoughby has endured years of litigation, ending with the loss of her home. She was entitled to the benefit of the agreement for which she had bargained.

In light of the sale of Willoughby's home, we remand to the chancery court to craft an appropriate remedy.

I.

3

A.

In February 2006, TamiLynn Willoughby obtained a loan in the amount of $183,000 from GMAC Mortgage, LLC (GMAC). The loan was secured by a mortgage on Willoughby's home in Union Beach, New Jersey. In June 2006, Willoughby defaulted on the loan, and four months later GMAC filed a complaint to foreclose on her home. In August 2007, GMAC obtained a final judgment for $205,915.30 on the defaulted loan.

A Sheriff's sale of Willoughby's home was scheduled for September 2009. The chancery court granted Willoughby's motion to stay the Sheriff's sale and permitted the parties to participate in New Jersey's Foreclosure Mediation Program.

At mediation sessions on April 13 and May 25, 2010, Willoughby met with GMAC's attorney to discuss settlement terms. At the May 2010 mediation session, the parties reached an agreement, which was memorialized in a "Foreclosure Mediation Settlement Memorandum" -- a form document provided by the Judiciary.

A preamble to the Settlement Memorandum states: "The parties agree that the foreclosure action is resolved upon the following terms, conditions, and covenants." (emphasis added). GMAC's attorney handwrote the settlement terms into the blank section of the Settlement Memorandum. He began by noting that Wiloughby was "being offered a trial to permanent modification

4

plan contingent on signed modification documents and an initial down payment." (emphasis added). The Agreement states that Willoughby will (1) make a $6000 down payment to GMAC by June 7, 2010; (2) repay the estimated principal balance of $215,365.30, amortized at a rate of five percent over 480 months; and (3) make monthly payments estimated at $1678.48. In addition, the Agreement indicates "$71,736.39 in arrears will be put into a non interest bearing balloon that is payable upon maturity, refinance, or sale."

The Settlement Memorandum includes certain handwritten guarantees: "If all trial payments are made [GMAC] will make modification permanent," but "[i]f any payment is missed, [GMAC] will continue with foreclosure." (emphasis added). Finally, the Memorandum provides, in boilerplate language, that "[t]he parties agree that when executed this mediation settlement memorandum shall be final, binding and enforceable upon all parties." (emphasis added). Willoughby and GMAC's attorney signed the Agreement.

Following the signing of the Settlement Memorandum, the mediator filed with the chancery court a "Foreclosure Mediation Completion Report" on which he checked off two boxes: "Provisional Settlement -- No Need to Reschedule Mediation (Case Not Dismissed)" and "Loan Modification."

In accordance with the Settlement Memorandum, Willoughby

5

delivered the $6000 down payment by cashier's check to GMAC's counsel. Several weeks later, Willoughby signed a "Forbearance Agreement" forwarded to her by GMAC's servicing agent that reflected some of the basic terms of the Settlement Memorandum. The Forbearance Agreement required Willoughby to make monthly payments of $1678.48 through June 1, 2011. Willoughby made each payment.

By letter dated June 7, 2011, a different servicing agent of GMAC forwarded to Willoughby a wholly new loan modification agreement because she "successfully completed the requirements of [her] Special Forbearance Program." The new loan proposal had a maturity term of twenty-five years instead of forty years, also at an amortization rate of five percent, but required monthly payments of $1814.52 instead of $1678.48. The new balloon payment due on the date of the loan's maturity was $114,362.41 instead of the $71,736.39 due under the May 2010 Agreement. The letter did not suggest that the terms were subject to negotiation. Willoughby did not sign the new loan modification agreement as directed in the letter, but she did begin making monthly payments of $1814.78.

GMAC's second servicing agent sent Willoughby two other modification agreements in December 2011 and May 2012 with slightly different terms than the June 7, 2011 proposal. In these new proposed agreements, the amortization rate was

increased to 5.5%.  Willoughby did not accept the new loan modification agreements but continued making the $1814.78 monthly payments.

By letter dated August 30, 2012, GMAC's servicing agent returned Willoughby's monthly payment and advised that her loan would be "referred to foreclosure" because of her failure to sign the proposed May 2012 modification agreement.  At this point, Willoughby had made payments over a period of sixteen months totaling $58,790.69 under the May 2010 Agreement.

In September 2012, Willoughby filed a pro se motion to enforce the May 2010 Agreement.[1]  Instead of deciding the motion, the chancery court ordered the parties to return to mediation. The court apparently did not advise the unrepresented litigant that she had a right to appeal its order.

At a mediation session in October 2012, GMAC offered Willoughby an "Interim Provisional Settlement" with new loan modification terms:  a required down payment of $3630, a maturity term of thirty years on an unpaid principal balance of $181,783.82 with a 6.125% amortization rate, and monthly payments of approximately $1805.  GMAC rejected a counteroffer made by Willoughby.

As the deadline for accepting GMAC's offer neared,

---

[1] Willoughby apparently failed to serve the motion on GMAC.

Willoughby provided cashier's checks for the down payment and verbally indicated that she accepted GMAC's terms. Ultimately, however, she did not execute the loan modification documents forwarded by GMAC. GMAC then revoked the offer.

Some time before this revocation, GMAC had received $132,682.66 in insurance proceeds for extensive damage caused to Willoughby's home as a result of Hurricane Sandy.[2] Willoughby claimed that, although she made repairs to her home, she never received any part of the insurance proceeds or credit against the monies owed on the loan.

### B.

In August 2013, the chancery court granted GMAC's motion to have FRT2001-1 Trust (the Trust) substituted as plaintiff in the foreclosure action because the loan and mortgage had been transferred to the Trust. The court, however, denied Willoughby's motion to enforce the May 2010 Loan Modification Agreement, finding that it was a "provisional settlement" as evidenced by Willoughby's submission to subsequent mediation sessions. Additionally, the court apparently believed that the May 2010 Agreement was not signed by Willoughby. Last, the court rejected Willoughby's motion to compel release of insurance proceeds held by GMAC.

---

[2] GMAC maintained insurance on Willoughby's premises.

Later, the chancery court denied Willoughby's motion to reconsider the enforceability of the May 2010 Agreement. The court also declined Willoughby's request for an accounting of the money owed on the 2007 final judgment of $205,915.30. Willoughby asserted she was entitled to credit against the loan for the monies she paid since the May 2010 Agreement and for the insurance proceeds received by GMAC.

On November 4, 2013, Willoughby's home was sold to GMAC at a Sheriff's sale for $100. The Sheriff had set the redemption figure at $292,691.92. Willoughby moved to set aside the Sheriff's sale on the ground that she did not receive proper notice of the sale date. She also claimed that the redemption figure was inaccurate because it did not account for her payments on the loan or GMAC's receipt of the insurance proceeds.

### C.

In an unpublished opinion, a panel of the Appellate Division affirmed the chancery court's determination that the May 2010 Agreement was unenforceable. The panel asserted that the May 2010 Agreement was provisional -- "a temporary agreement to be replaced by a permanent mortgage modification signed by the parties." According to the panel, because Willoughby never signed a permanent modification agreement offered by GMAC, the parties never achieved a meeting of the minds for an enforceable

agreement.  The panel also concluded that the chancery court did not err in declining to vacate the Sheriff's sale based on Willoughby's lack-of-notice argument.  The panel found it telling that Willoughby did not file a certification "asserting that she had sufficient funds to bid at the sale whenever it was held."

We granted Willoughby's petition for certification.  GMAC Mortg., LLC v. Willoughby, 227 N.J. 146 (2016).  We also granted the motions of the Seton Hall Law Center for Social Justice, the Housing and Community Development Network of New Jersey, New Jersey Citizen Action, and La Casa de Don Pedro, collectively, to appear as amici curiae.[3]

II.

A.

Willoughby argues that the May 2010 Foreclosure Mediation Settlement Memorandum is a binding and enforceable contract. That is so, says Willoughby, because the Memorandum reveals that the "parties mediated, agreed upon material terms, memorialized the terms and executed the document."  She claims that GMAC reneged on the Agreement after she made $58,790.69 in payments.

---

[3] The Seton Hall Law Center for Social Justice filed an amicus curiae brief in support of Willoughby's petition for certification.  The Housing and Community Development Network of New Jersey, New Jersey Citizen Action, and La Casa de Don Pedro filed a joint brief authored by the Seton Hall Law Center for Social Justice.

10

Willoughby indicates that she rejected GMAC's subsequent "permanent" mortgage modification offers because the terms were materially different from those contained in the May 2010 Agreement. She further contends that the Judiciary's policy of encouraging negotiated settlements will be undermined if courts do not honor and enforce agreements reached through the mediation process.

Willoughby additionally maintains that the chancery court erred in denying her request for an accounting of the balance of the loan. She submits that the redemption figure at the Sheriff's sale should have been reduced by her payments of $58,790.69 on the May 2010 Agreement and by the $132,682.66 of insurance proceeds received by GMAC for damage caused to her home by Hurricane Sandy.

B.

Amici curiae, collectively or individually, submit that GMAC's failure to honor a valid settlement agreement brokered through the Judiciary's Foreclosure Mediation Program -- and the chancery court's failure to enforce the agreement -- undermines the public policy embodied in the Program. Amici state that, despite a fully executed mediation agreement, GMAC "repeatedly and unilaterally altered the material terms of [that] agreement." Amici assert that Willoughby did not abandon the May 2010 Agreement and was not a truly willing participant in

11

the October 2012 court-ordered mediation.

Amici criticize the chancery court not only for "condoning [GMAC's] repudiation of the settlement," but also for leaving "Willoughby no choice but to re-enter mediation and accept whatever new terms [GMAC] imposed or suffer the loss of her home." Finally, amici recommend that the Judiciary's Foreclosure Mediation form include a category indicating "Final Settlement (Case Not Dismissed)" and that compliance with the agreement's terms be monitored with final action to occur by a specified time.

C.

GMAC counters that Willoughby's appeal is moot because the Sheriff's sale resulted in the transfer of ownership of her home to a purchaser, and therefore she no longer has any vested right to the property. GMAC also argues that it did not enter into a final, enforceable loan modification in May 2010. That is clear, GMAC submits, because "[b]y continuing to negotiate long after May 2010, both parties demonstrated their intent not to be bound by [the May 2010] agreement." Indeed, GMAC asserts that the counteroffer made by Willoughby during the October 2012 mediation sessions acted as "a clear rejection of any offer which preceded it because her intention to be bound by different terms was plainly expressed." In that connection, GMAC argues that by making the down payment on the October 2012 agreement,

12

Willoughby created a novation, nullifying any previous agreement reached by the parties.

Last, GMAC stresses that an accounting of the redemption amount set by the Sheriff was not warranted. GMAC insists that: (1) the redemption amount reflected "the accrual of six years of post-judgment interest" as well as various costs related to the listing of the property for sale; (2) GMAC properly did not credit the insurance proceeds against the foreclosure judgment because the proceeds compensated for "loss of value" to GMAC's "collateral"; and (3) Willoughby "clearly knew both the amount required to redeem and the amounts she was claiming as a credit."

## III.

The primary issue in this case is whether GMAC and Willoughby entered into a permanent or provisional loan modification agreement in May 2010. At its core, we are dealing with a contractual dispute, and, like all such disputes, the language of the agreement typically governs. The issue here, however, also implicates our Residential Mortgage Foreclosure Mediation Program -- a Program intended to bring homeowners and lenders to amicably mediated resolutions, if possible, and not to foster endless rounds of mediation or litigation. The Program's salutary goals can only be met if our chancery courts enforce mediated settlements.

We begin by noting the standard of review. In determining the meaning or validity of a contract, our review is de novo. Morgan v. Sanford Brown Inst., 225 N.J. 289, 302 (2016) (citing Atalese v. U.S. Legal Servs. Grp., L.P., 219 N.J. 430, 445-46 (2014), cert. denied, ___ U.S. ___, 135 S. Ct. 2804, 192 L. Ed. 2d 847 (2015)). We accord no special deference to the trial court's or Appellate Division's interpretative analysis and "look at the contract with fresh eyes." See Kieffer v. Best Buy, 205 N.J. 213, 223 (2011). Our only charge is to give a faithful and logical reading to the words chosen by the parties to the agreement.

A.

The public policy of this State favors the settlement of disputes through mediation. Willingboro Mall, Ltd. v. 240/242 Franklin Ave., L.L.C., 215 N.J. 242, 253-54 (2013). Parties who are risk averse settle disputes because they are spared not only the potential of an unfavorable outcome, but also the certainty of protracted litigation with oftentimes skyrocketing costs. Ibid. Our Court Rules encourage mediation, which has become an integral part of our civil justice system through Complementary Dispute Resolution Programs. R. 1:40-1. Under Rule 1:40-4(a), Superior Court judges are empowered to order "parties to attend a mediation session at any time following the filing of a complaint" in matters involving the family part, R. 1:40-5;

14

civil, probate, and general equity, R. 1:40-6; and even minor disputes in municipal court, R. 1:40-8.

In response to the unprecedented foreclosure crisis in this State caused by the crash of the housing market in 2007-2008, the New Jersey Judiciary created the Residential Mortgage Foreclosure Mediation Program. In the wake of the crash, thousands of families who could no longer meet their mortgage payments faced foreclosure actions and the loss of their homes. See Hon. Glenn A. Grant, J.A.D., Residential Mortgage Foreclosure Mediation Program – Rule Relaxation Order 1 (Nov. 17, 2008), http://www.judiciary.state.nj.us/notices/2008/n081120a.pdf ("[T]he number of residential mortgage foreclosure actions recently filed in the Superior Court of New Jersey demonstrates that New Jersey is suffering a mortgage foreclosure crisis.").

The Residential Foreclosure Mediation Program mandates mediation in all cases in which homeowners, who occupy their residences, contest foreclosure actions. Press Release, New Jersey Courts, Judiciary Announces Foreclosure Mediation Program to Assist Homeowners at Risk of Losing Their Homes (Oct. 16, 2008), http://www.njcourts.gov/courts/assets/scco/pr081016c.pdf. Through the auspices of the Program, homeowners and their lenders "meet in a neutral forum to talk frankly and earnestly about how they might restructure a mortgage that will let

homeowners remain in their homes." New Jersey Courts Annual Report 2009-2010, at 2, http://www.judiciary.state.nj.us/public/assets/annualreports/annual%20report%202010.pdf.

After GMAC secured a foreclosure judgment against Willoughby for defaulting on her loan and scheduled a Sheriff's sale of her home, the chancery court ushered the parties into the Foreclosure Mediation Program in response to a motion filed by Willoughby.

B.

Mediation sessions in April and May 2010 led to a settlement agreement between GMAC and Willoughby that was reduced to writing on a judiciary form document entitled "Foreclosure Mediation Settlement Memorandum." The parties do not dispute whether they entered a settlement; they dispute whether it was a provisional or permanent loan modification agreement.

Contract law governs the interpretation of a settlement agreement. Thompson v. City of Atlantic City, 190 N.J. 359, 379 (2007). Like any contract, a valid settlement agreement requires an "offer and acceptance" by the parties, and the terms of the agreement must "be sufficiently definite [so] 'that the performance to be rendered by each party can be ascertained with reasonable certainty.'" Weichert Co. Realtors v. Ryan, 128 N.J.

16

427, 435 (1992) (quoting West Caldwell v. Caldwell, 26 N.J. 9, 24-25 (1958)).

Although the Agreement in this case is not free of all ambiguity, the terms are nevertheless sufficiently definite and detailed to indicate, with reasonable certainty, that the parties intended a permanent loan modification. Significantly, GMAC's attorney handwrote the key provisions into blank spaces on the Settlement Memorandum. See In re Estate of Miller, 90 N.J. 210, 221 (1982) ("Where an ambiguity appears in a written agreement, the writing is to be strictly construed against the draftsman."). GMAC cannot complain about the language it penned in the Settlement Memorandum. See Kieffer, supra, 205 N.J. at 224 ("[W]here one party chooses the term of a contract, he is likely to provide more carefully for the protection of his own interests than for those of the other party." (alteration in original) (quoting Pacifico v. Pacifico, 190 N.J. 258, 268 (2007))). Our task is to enforce the contract according to its terms, giving those terms "their plain and ordinary meaning." Id. at 223 (quoting M.J. Paquet, Inc. v. N.J. Dep't of Transp., 171 N.J. 378, 396 (2002)). We cannot "rewrite a contract for the parties better than or different from the one they wrote for themselves." Ibid.

The Memorandum denominated the Agreement as "a trial to permanent modification plan contingent on signed modification

17

documents and an initial down payment." (emphasis added). Willoughby signed the documents and paid the $6000 down payment. The Memorandum, moreover, set forth the precise terms of the Agreement: (1) the estimated principal balance ($215,365.30); (2) the length of the loan (480 months); (3) the amortization rate (five percent); (4) the estimated monthly payments ($1678.48); and (5) the balloon payment due on maturity of the loan ($71,736.39). The Agreement stated that if Willoughby made "all trial payments," GMAC would "make modification permanent." (emphasis added). Willoughby made all the trial payments. Last, Willoughby and GMAC's attorney both signed the "mediation settlement memorandum," which the parties agreed was "final, binding and enforceable upon all parties." Willoughby also signed the "Forbearance Agreement" forwarded by GMAC's servicing agent.

The Settlement Memorandum has all of the indicia of a permanent and binding agreement. Willoughby relied on a reasonable interpretation of the Agreement in making payments to save her home. The mediated settlement between GMAC and Willoughby conformed to the dictates of Rule 1:40-4(i) and Willingboro. Rule 1:40-4(i) requires that a mediation agreement that "results in the parties' total or partial agreement . . . be reduced to writing, signed by each party, and furnished to each party." Willingboro, supra, further elucidated that "a

18

'signed agreement' would include 'a handwritten agreement that the parties have signed.'" 215 N.J. at 257 (quoting Uniform Mediation Act § 6(a)(1) cmt. 2 (Nat'l Conference of Comm'rs on Unif. State Laws, 2003)).

Nothing in this Agreement suggested that, after a period of twelve months, GMAC could unilaterally demand that Willoughby agree to a new loan modification on different terms than those that appeared in the Settlement Memorandum. GMAC claims that it reserved to itself the right to reduce the length of the loan, to require higher monthly payments, and to set an increased amortization rate -- even after Willoughby had paid $58,790.69 under the May 2010 Agreement. The language of the Settlement Memorandum, however, does not give GMAC carte blanche to compel Willoughby to accept new proposed loan modification agreements and continued mediation sessions.

Beginning in June 2011, a different servicing agent for GMAC forwarded to Willoughby three different proposed loan modification agreements -- all three at variance with the terms of the May 2010 Agreement. The new proposals had shorter maturity dates and higher monthly payments, and two had increased amortization rates. Apparently fearing that GMAC would restart the foreclosure action, Willoughby began making increased monthly payments of $1814.78 instead of the $1678.48 payment required by the May 2010 Agreement. Willoughby,

19

however, did not sign any of the new loan modification agreements.  In response, GMAC refused to accept any further payments and referred her case for foreclosure.

Willoughby then looked to our courts for protection.  She filed a pro se motion to enforce the May 2010 Agreement.  Instead of conducting a hearing on the motion and enforcing that Agreement, the chancery court returned the case to mediation.  That is the point at which this case went awry.  Willoughby was compelled to proceed with mediations and negotiations with GMAC in a effort to save her home.

In Gonzalez v. Wilshire Credit Corp., 207 N.J. 557, 582 (2011), we recognized that, in the same unprecedented foreclosure crisis that overwhelmed Willoughby, citizens in last-ditch efforts to save their homes entered into unfavorable agreements for the extension of credit.  We also acknowledged the plight of unsophisticated homeowners "bowed down by a foreclosure judgment and desperate to keep their homes under seemingly any circumstances."  Id. at 584.  Gonzalez, unlike the present case, dealt with predatory lending practices.  But, in her own way, Willoughby struggled, perhaps not deftly, to save her home by continuing with mediations and negotiations because of her failure to secure the relief to which she was entitled by the chancery court.

We do not find that a novation of the May 2010 Agreement

20

ever occurred.  A novation is when the parties agree to substitute a new validly executed contract for a previous contract.  Wells Reit II--80 Park Plaza, LLC v. Director, Div. of Taxation, 414 N.J. Super. 453, 466 (App. Div. 2010). Critically, a novation requires that the parties intend to "extinguish the old contract."  Ibid.

Here, the record establishes that Willoughby never voluntarily abandoned the May 2010 Agreement.  Having failed to enforce the valid May 2010 Agreement in the chancery court, Willoughby desperately tried to keep her home from foreclosure -- she made a counteroffer to one of GMAC's proposals, which GMAC rejected, and then made a down payment on the GMAC proposal. But, in the end, Willoughby did not sign the documents necessary to execute a contract superseding the May 2010 Agreement. Willingboro, supra, 215 N.J. at 256-57 (noting that mediated settlement requires "signed agreement").  Indeed, before the Sheriff's sale, Willoughby renewed her efforts to enforce that Agreement with the guiding hand of counsel.

### C.

In this case, through the medium of the Judiciary's Foreclosure Mediation Program, GMAC and Willoughby entered into a loan modification agreement, which provided that if Willoughby made all the trial payments, the agreement would become permanent.  Willoughby carried out her part of the bargain.  The

21

chancery court should have granted Willoughby's pro se motion to enforce the agreement. As we have said before, homeowners facing foreclosure -- many of whom do not have the benefit of counsel -- are particularly vulnerable when mired in financial difficulties. Our chancery courts are courts of equity and therefore must take pains to ensure that such homeowners receive the protection of the law from lending institutions and servicing agents who may seek unfair advantage. We do not suggest that GMAC and its servicing agents acted in bad faith. Both the chancery court and Appellate Division erred, however, in not enforcing the agreement as a permanent loan modification.

D.

We agree with amicus curiae Seton Hall Law Center for Social Justice that the Mediation Program Completion Report should provide a check-off category entitled "Final Settlement (Case Not Dismissed)." Such language, or similarly styled language, would make clear the type of agreement reached in this case where the final settlement was contingent on the homeowner making trial payments over a period of time. If the homeowner complies with the contingent terms of the agreement, as occurred here, the foreclosure action would be dismissed.

IV.

We remand to the chancery court to fashion a suitable and equitable remedy. Willoughby will not be entitled to specific

22

performance if her home has been sold to a bona fide, good faith purchaser.  See Dean v. Anderson, 34 N.J. Eq. 496, 508 (Ch. 1881); cf. Marioni v. 94 Broadway, Inc., 374 N.J. Super. 588, 611 (App. Div. 2005).  One wrong cannot be remedied by committing another one.  In the absence of specific performance, however, Willoughby is entitled to damages, if any, for breach of contract.  In performing that calculation, the chancery court may consider all relevant facts, including the $58,790.69 in payments made by Willoughby under the May 2010 Agreement, the $132,682.66 in insurance proceeds GMAC received for damage caused to Willoughby's home, and the time Willoughby spent in her home without making any monthly payments.  We leave to the sound discretion of the chancery court the determination whether Willoughby suffered financial damages and, if so, the amount.

V.

For the reasons expressed, we reverse the judgment of the Appellate Division and remand to the chancery court for proceedings consistent with this opinion.

CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in JUSTICE ALBIN's opinion.

23