**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2661-22

PARK ROAD DEVELOPMENT,
LLC,

    Plaintiff-Appellant,

v.

AKGG, LLC,

    Defendant-Respondent.

_____

> Submitted September 9, 2024 – Decided September 24, 2024
>
> Before Judges Gooden Brown and Chase.
>
> On appeal from the Superior Court of New Jersey, Chancery Division, Cape May County, Docket No. C-000068-21.
>
> Cooper Levenson, PA, attorneys for appellant (Fredric L. Shenkman, on the briefs).
>
> Hornstine & Vanderslice, LLC, attorneys for respondent (Brian A. Pelloni, on the brief).

PER CURIAM

Plaintiff Park Road Development, LLC ("Park Road"), appeals from the trial court's April 21, 2023 final judgment denying its complaint seeking specific performance by AKGG, LLC ("AKGG"), pursuant to a contract to sell three adjoining lots in Sea Isle City ("Agreement"). We affirm.

I.

AKGG is the owner of a property which consists generally of lots located at 4216 Park Road and a portion of 4210 Park Road in Sea Isle City ("Property"). AKGG is comprised of two principals, Gloria Giampietro and Ann Marie Kelly. Giampietro and Kelly are sisters and have been business partners for decades. Giampietro is the managing member and spokesperson of AKGG; however, the longstanding policy between the sisters was that all business decisions would be jointly made.

Park Road is comprised of two principals, Frank Edwardi and Michael Monichetti. Edwardi and Monichetti formed Park Road for the sole purpose of acquiring and developing the Property. Edwardi is a real estate developer and Sea Isle City councilman. Monichetti owns a local seafood restaurant and store located adjacent to the Property. Edwardi and Monichetti jointly manage Park Road and have otherwise operated as business partners for several years. Edwardi reviews binding documents on behalf of Park Road.

In March 2021, AKGG listed the Property for sale.  AKGG entered into a listing agreement with T.I. Realty Group ("T.I.") and Christopher Glancey, giving T.I. the exclusive right to sell the Property and naming Glancey the broker of record and AKGG's agent.  All negotiations for the sale of the Property occurred through Glancey.  Park Road and AKGG never communicated directly regarding the sale.

Don Wilkinson, Esq., was retained to represent Park Road in the transaction.  Wilkinson spoke to Glancey with the understanding Glancey was either an agent for Park Road as the buyer or a disclosed dual agent.  Wilkinson sent a draft of the proposed Agreement to both Glancey and Edwardi purporting to convey the Property from AKGG to Park Road for $3.6 million.  Due to difficulty ascertaining the bounds of the Property to be conveyed from the local tax maps, Wilkinson inserted language into the draft Agreement describing the conveyance as Lots 6, 7, 8, and "an approximate ten foot (10') wide portion of Current Lot 9."  Wilkinson also informed Glancey and Edwardi of his uncertainty to the amount of land involved in the transaction.

On April 28, 2021, AKGG and its attorney, Anthony Monzo, Esq., reviewed the Agreement.  Park Road and AKGG subsequently executed the

3

Agreement and an addendum the same day. The addendum stated in pertinent part:

> The real property to be sold is known as 4216 Park Road and a portion of 4210 Park Road in the City of Sea Isle City, in the County of Cape May, and State of New Jersey. It is shown on the municipal tax map as Lot(s) 4, 5, 6.01, 6.02, 7, 8, <u>and an approximate ten foot (10') wide portion of current Lot 9</u> (to be created by subdivision pursuant to Article 34) Block 41.05.
>
> [(emphasis added).]

Additionally, the addendum changed the closing date and shortened the due diligence period to forty-five days contingent on subdivision approval from the Sea Isle City Planning Board.

The "Due Diligence Inspection" provision of the Agreement stated, in pertinent part, that Park Road would

> investigate and determine [Park Road's] ability to subdivide and develop the property into three separate conforming lots and develop on each lot a mixed[-]use structure in conformance with all applicable governmental zoning and building regulations. If [Park Road] determines that it is not satisfied in its sole discretion . . . [Park Road] may terminate.

Edwardi testified he had no definitive plans for developing the Property when signing the Agreement, and when he did ultimately sign, he did not know what the term "approximate" meant regarding the amount of land to be conveyed.

A-2661-22

After the due diligence period expired and Wilkinson reviewed the survey of the land, he was still unable to determine the amount of land involved in the transaction. Wilkinson calculated the amount of frontage for lots involved, which amounted to 140 feet; however, Wilkinson marked "150??" to indicate the discrepancy between the amount of land calculated and the amount his clients expected to receive in the sale. Wilkinson then drafted a second addendum to the Agreement, which stated the amount of land to be conveyed should not be less than 150 feet of frontage. This was the first time a document involved in the sale described the Property to be no less than 150 feet. AKGG never executed this addendum.

Monzo contacted Wilkinson expressing AKGG's concerns that the addendum described the sale of 150 total feet of frontage, which included twenty feet of Lot 9, when AKGG understood the sale to include only ten feet. Monzo requested a copy of the concept plan of the subdivision to ensure it was consistent with the parties' understanding when entering into the agreement. After receiving notice of the dispute over the amount of land, Edwardi indicated to Park Road's surveyor, Ryan McCreesh, that the subdivision plans needed to reflect three lots each consisting of fifty feet of frontage in order to develop the

5 <span>A-2661-22</span>

land in compliance with local ordinances without a need for variances.[1] Wilkinson, Glancey, and Edwardi then prepared an exhibit plan detailing 150 feet of frontage to be purchased by Park Road and sixty feet to be retained by AKGG, thus establishing three lots each consisting of the required fifty feet.

Monzo advised Wilkinson the concept plan was inconsistent with both the language and AKGG's understanding of the Agreement because the concept plan would leave the sellers ten feet short of the amount of land contemplated on Lot 9 as detailed in the Agreement. Monzo indicated the subdivision application would need to contain larger dimensions so AKGG would retain their expected amount of Lot 9.

Park Road nonetheless submitted its subdivision application to the Sea Isle City Planning Board without AKGG's consent and with knowledge of AKGG's opposition to the plan as written. Thereafter, AKGG sent Park Road a letter dated September 14 indicating AKGG would not provide their signature

---

[1] According to the Sea Isle City Code Section 26-54.8 concerning minimum lot area dimensions in the Marine Commercial/Industrial District, where the Property is situated, "No lot shall be less than fifty (50') feet wide at the street line or less than ninety-five (95') feet deep." The Lots subject to the Agreement were each 100 feet deep but there is a discrepancy amongst the parties as to the amount of land at the "street line" being sold. To remain compliant with the local ordinance, Park Road would need to obtain fifty feet per lot. AKGG allegedly expected to sell only forty feet of Lot 9, thus this dispute arose.

of approval for the subdivision plan. AKGG sent notice of its cancellation of the Agreement based on Park Road's attempt to apply for a subdivision inconsistent with the terms of the Agreement.

Park Road then filed a complaint for specific performance claiming it would suffer irreparable harm that could not be made whole by monetary damages if AKGG refused to go forward with the Agreement. Park Road asserted AKGG's conduct was performed wantonly, negligently, and in bad faith. The complaint sought relief against AKGG in the form of: (1) a declaration that Park Road had not anticipatorily breached the Agreement; (2) an order enjoining and restraining AKGG and ordering the performance pursuant to the Agreement thereby selling the Property to Park Road; (3) compensatory damages; (4) punitive damages if compensatory damages were awarded; (5) legal fees; (6) other related costs of the suit; (7) and any other relief deemed appropriate.

In its Answer, Counterclaim, and Third-Party Complaint, filed together, AKGG demanded an order dismissing Park Road's complaint, declaring Park Road breached the Agreement, and rendering the Agreement void and unenforceable. AKGG also demanded all other financial compensation related to damages, fees, and other associated costs. AKGG later dismissed its Third-

A-2661-22

Party Complaint without prejudice against T.I. and Glancey on the counts of breach of contract, breach of fiduciary duty, and breach of the implied covenant of good faith and fair dealing.

A three-day bench trial was held, after which the court made factual findings, assessed credibility, and applied the governing legal principles resulting in an April 2023 order dismissing Park Road's complaint and AKGG's counterclaim. The trial court further ordered the return of escrowed money to Park Road within thirty days of the Order.

In denying Park Road's complaint and AKGG's counterclaim, the court held there was no meeting of the minds between the parties which resulted in no enforceable contract being formed and, thus, no remedy available under contract law. The court demonstrated the uncertainty of the Agreement terms by referencing Wilkinson's uncertainty as scrivener of the Agreement. The court explained Wilkinson, after meeting with Edwardi and Glancey to discuss the dimensions of land involved, inserted the language "approximate" into the Agreement because neither Glancey nor Edwardi clearly stated what was being conveyed. The court scrutinized the initial Agreement being drafted by the buyer's attorney without a survey, then later obtaining a survey which calculated the land conveyed at 140 feet, and then subsequently including terminology like

"150??", and then drafting an addendum which provided the amount of land sold was no less than 150 feet.

Regarding Edwardi, the court determined no written instrument involved in this transaction included the phrase "buildable lot" as he testified to. The court determined Edwardi knew Wilkinson was unsure about the exact amount of land being conveyed through the Agreement and he did not know how the Property would be developed at the signing. The court further found Edwardi did not know what "approximate" meant in the Agreement.

Regarding Giampietro, the court found it difficult to discern her understanding of the Agreement. However, the court deferred to Monzo's testimony explaining his review of the Agreement with Giampietro and his notes from the meeting which reflected AKGG believed it was selling 140 feet of land to Park Road and not 150 feet.

The court found the record contained no credible evidence suggesting Park Road honestly believed it was purchasing 150 feet and not 140 feet. To support this finding, the court referenced Edwardi advising his surveyor on August 23, 2021, to prepare the exhibit plan with Park Road receiving 150 feet even though Edwardi was aware Monzo had informed Wilkinson of the discrepancy in the parties' understanding of the conveyance.

The court determined the discrepancy was the result of Park Road's failure to conduct due diligence in obtaining a survey of the Property. The court explained "[Park Road's] failure to exercise due diligence caused delays which could not have been rectified by the closing date, or even shortly thereafter." The court further explained that had Park Road taken the time to survey the Property, the discrepancy in the Agreement would have been discovered at a time when the Agreement could have been reformed by consent of the parties or cancelled altogether without any harm. The court held even if there was a meeting of the minds to create mutual assent, Park Road's lack of due diligence demonstrated it was not ready or willing to perform its obligations under the Agreement. On this point, the court concluded, due to the lack of understanding between the parties, no meeting of the minds could have occurred to form an enforceable contract, and additionally Park Road failed to prove the Property consisted of three fifty-foot lots despite the "approximate" language in the Agreement.

Park Road then initiated this appeal. Park Road's essential argument is they are entitled to reformation and the court's decision was against the weight of the evidence. Park Road also argues the court's consideration of extrinsic evidence was improper and violative of the parol evidence rule.

II.

Our review of a trial court's fact-finding in a non-jury trial is limited. Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011). Our inquiry is "whether . . . there is substantial evidence in support of the trial judge's findings and conclusions." Sipko v. Koger, Inc., 214 N.J. 364, 376 (2013) (quoting Seidman, 205 N.J. at 169). Appellate courts do not disturb the factual findings of the trial judge unless convinced that "they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Tractenberg v. Twp. of W. Orange, 416 N.J. Super. 354, 365 (App. Div. 2010) (quoting Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 484 (1974)); see also Beck v. Beck, 86 N.J. 480, 496 (1981).

"Deference is especially appropriate when the evidence is largely testimonial and involves questions of credibility. Because a trial court hears the case, sees and observes the witnesses, and hears them testify, it has a better perspective than a reviewing court in evaluating the veracity of the witnesses." Seidman, 205 N.J. at 169 (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). However, we owe no deference to a trial court's "interpretation of the law and the legal consequences that flow from established

11

facts[,]" Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995), and we review such decisions de novo, 30 River Court E. Urban Renewal Co. v. Capograsso, 383 N.J. Super. 470, 476 (App. Div. 2006) (citing Rova Farms, 65 N.J. at 483-84).

When issues on appeal present mixed questions of law and fact, we give deference to the supported factual findings of the trial court but review de novo the trial court's application of legal rules to the factual findings. State v. Pierre, 223 N.J. 560, 576 (2015); State v. Nantambu, 221 N.J. 390, 404 (2015); State v. Harris, 181 N.J. 391, 416 (2004). Such de novo review would include the interpretation of a contractual agreement. Serico v. Rothberg, 234 N.J. 168, 178 (2018); see also Kieffer v. Best Buy, 205 N.J. 213, 222 (2011).

Contract law requires "an 'offer and acceptance' by the parties, and the terms of the agreement must 'be sufficiently definite [so] "that the performance to be rendered by each party can be ascertained with reasonable certainty."'" GMAC Mortg., LLC v. Willoughby, 230 N.J. 172, 185 (2017) (quoting Weichert Co. Realtors v. Ryan, 128 N.J. 427, 435 (1992)) (alteration in original). For a contract to be formed, the parties must "agree on essential terms and manifest an intention to be bound by those terms. . . ." Weichert Co. Realtors, 128 N.J.

at 435. However, "[w]here the parties do not agree to one or more essential terms, . . . courts generally hold that the agreement is unenforceable." Ibid.

"The polestar of contract construction is to discover the intention of the parties as revealed by the language used by them." Karl's Sales & Serv. v. Gimbel Bros., 249 N.J. Super. 487, 492 (App. Div. 1991). A legal and enforceable contract requires proof of: (1) a meeting of the minds and (2) mutual assent between the parties. Johnson & Johnson v. Charmley Drug Co., 11 N.J. 526, 538 (1953). A meeting of the minds is "evidenced by each side's express agreement to every term of the contract." State v. Ernst & Young, L.L.P., 386 N.J. Super. 600, 612 (App. Div. 2006).

"Generally, the terms of an agreement are to be given their plain and ordinary meaning." M.J. Paquet, Inc. v. N.J. Dept. of Transp., 171 N.J. 378, 396 (2002) (citation omitted). "[W]here the terms of a contract are clear and unambiguous[,] there is no room for interpretation or construction and the courts must enforce those terms as written." Karl's Sales & Serv., 249 N.J. Super. at 493 (citing Kampf v. Franklin Life Ins., 33 N.J. 36, 43 (1960)); see also Cnty. of Morris v. Fauver, 153 N.J. 80, 103 (1998). Courts may not "remake a better contract for the parties than they themselves have seen fit to enter into, or to alter it for the benefit of one party and to the detriment of the other." Karl's

Sales & Serv., 249 N.J. Super. at 493 (citing James v. Fed. Ins., 5 N.J. 21, 24 (1950)). "A court has no power to rewrite the contract of the parties by substituting a new or different provision from what is clearly expressed in the instrument." E. Brunswick Sewerage Auth. v. E. Mill Assocs., 365 N.J. Super. 120, 125 (App. Div. 2004).

III.

Park Road contends the trial court failed to give the proper weight to the Agreement signed by the parties and the provisions contained therein which gave meaning to the term "approximate" as it related to the ten-foot conveyance of Lot 9. They further argue the court erred in finding Giampietro's testimony partially credible and relying on it in denying their complaint. Park Road explains Giampietro's conflicting testimony and the court labeling it as "confused" should have resulted in prohibiting any portion of the testimony from being considered.

The court's findings based on the evidence and testimony presented, combined with the conduct of the parties involved during the negotiating of the Agreement, provide sufficient credible evidence for the trial court's determination that there was no meeting of the minds. The record is replete with evidence of uncertainty as to the exact terms being negotiated in the Agreement

14

and differences of opinion between Park Road and AKGG. The only consistent fact is Park Road desired to purchase three lots owned by AKGG that were adjacent to Monichetti's restaurant and store for some type of development project and AKGG desired to sell those lots. Beyond that, the parties were at odds throughout the remainder of negotiations and the transaction.

The evidence suggests Park Road and AKGG agreed to complete the sale of three lots, in full, along with a portion of a fourth lot with AKGG retaining some of the lot. The initial transaction was for an amount that totaled 140 feet of frontage across the four lots combined; however, after Park Road learned that amount of land would be insufficient for approval of a subdivision for development without the need for a variance, they determined they would need to purchase 150 feet of frontage instead. AKGG did not desire to sell more than the 140 feet initially agreed to, and this disagreement led to litigation and the present appeal. The trial court determined the uncertainty concerning the amount of land involved in the Agreement was evidenced by the testimony of not only Giampietro, but the attorneys, the owners of Park Road, and even the surveyor. Thus, even with the questionable nature of Giampietro's testimony regarding her understanding of the Agreement terms, there is overwhelming

15

evidence in the record that supports the trial court's finding no meeting of the minds or mutual assent present for a valid and enforceable contract to exist.

Beyond the testimony the trial court considered, the terms of the Agreement itself are evidence of the lack of mutual assent. Wilkinson's addendum including the term "150??", a clear indication of the uncertainty toward the amount of land involved, shows the parties were negotiating a deal in which neither side was ever in lockstep on the terms. Given the deferential standard of review and the applicable legal principles, Park Road and AKGG never expressly agreed or demonstrated their unequivocal assent to the terms of the Agreement.

IV.

We disagree with Park Road's assertion the trial court erroneously attributed too much weight to documentary evidence created after the Agreement was signed. Park Road reasons the Agreement terms, specifically the term "approximate," were not ambiguous and thus any use of extrinsic evidence violated the parol evidence rule. Park Road argues the court erroneously attributed greater weight to the semantics of the situation when substantial evidence was provided explaining the custom, usage, and the parties' interpretation of the Agreement's terms.

16

Our Supreme Court has adopted an expansive view of the parol evidence rule that permits consideration of "all of the relevant evidence that will assist in determining the intent and meaning of the contract." Conway v. 287 Corp. Ctr. Assocs., 187 N.J. 259, 269 (2006). Thus, when the terminology used in a contract is not free from doubt as to its meaning, a party should be given an opportunity to present evidence of extrinsic circumstances that bear on the proper interpretation of the document's language. Schor v. FMS Fin. Corp., 357 N.J. Super. 185, 192 (App. Div. 2002).

"In general, the parol evidence rule prohibits the introduction of evidence that tends to alter an integrated written document." Conway, 187 N.J. at 268. However, as we have made clear,

> the parol evidence rule appl[ies] only to prevent the substantive alteration of contractual terms agreed upon by parties and expressed in an integration of their bargain, by resort to other prior or contemporaneous agreements or understandings. But the parol evidence rule does not even come into play until it is first determined what the true agreement of the parties is— i.e., what they meant by what they wrote down. Only when that is determined is one in an appropriate position to raise the bar of the parol evidence rule to prevent alteration or impugnment of the agreement by the asserted contradictory prior or contemporaneous agreement. . . . [I]n the process of interpretation and construction of the integrated agreement[,] all relevant evidence pointing to meaning is admissible because experience teaches that language is so poor an

A-2661-22

instrument for communication or expression of intent that ordinarily all surrounding circumstances and conditions must be examined before there is any trustworthy assurance of derivation of contractual intent, even by reasonable judges of ordinary intelligence, from any given set of words which the parties have committed to paper as their contract.

[Garden State Plaza Corp. v. S.S. Kresge Co., 78 N.J. Super. 485, 496 (App. Div. 1963).]

Here, considering all the circumstances both prior to and after the drafting of any document relating to this transaction, it is completely unclear as to the intent and understanding of the parties in attempting to execute a sale of the Property. The record is chock-full with evidence of miscommunications and misunderstandings as to the basic terms of the Agreement, which, in turn, demonstrate an unclear intent of the parties in buying and selling the land. Even beyond the evidence in the record, the parties' arguments on appeal further evidence the lack of clarity in this attempted transaction. Park Road argues for the sale of 150 feet of frontage of the Property while AKGG argues for the sale of 140 feet. Neither party agrees as to which quantum of land is correct or when either number was the true term of the Agreement. Due to the lack of clarity, the court was required to determine the intent and meaning of the Agreement to the extent that the quantum of land could even be determined from the evidence presented, previous negotiations, and communications between the parties.

18

Because the court was at the initial phase of understanding the parties' intent and understanding of the deal without even considering the terms of the Agreement itself, the parol evidence rule is not triggered, and the court was permitted to rely on extrinsic evidence such as Monzo's handwritten notes. These notes are merely jotted down comments on the terms of the Agreement as Giampietro and Kelly understood them and what steps Monzo might be able to take as the matter began requiring further legal action. Had the parol evidence rule been triggered, the court could have reached the same outcome without having to consider these notes. Nevertheless, the parol evidence rule is not in effect here, and the court's denial of Park Road's complaint was correct.

We also disagree with Park Road's assertion they are entitled to contract reformation due to the mutual mistake of facts between the parties. Park Road explains a mutual mistake of fact exists due to their belief they were purchasing 150 feet of land under the Agreement. Park Road asserts the only evidence suggesting they were purchasing 140 feet of land rather than 150 feet was Monzo's handwritten notes which were created long after the parties signed the Agreement and thus should not be considered.

19

Park Road asserts the parties' intentions are abundantly clear when the terms of the Agreement are considered together. Park Road explains the Agreement, when read in its entirety and without isolating the one instance of the term "approximate," demonstrates a mutual misunderstanding of the term "approximate" by the parties. Park Road further explains its understanding of the term is logical when considering the circumstances surrounding the desire to enter into the Agreement with AKGG. Park Road posits the plain language of the Agreement is not ambiguous and creates the implication that Park Road was purchasing three buildable lots from AKGG without creating any additional hardship or delays in completing the sale and beginning development on the lots.

Reformation of a contract has been used as an equitable remedy where a contract cannot be rescinded. Dugan Constr. Co. v. N.J. Tpk. Auth., 398 N.J. Super. 229, 242 (App. Div. 2008); see also Bonnco Petrol, Inc. v. Epstein, 115 N.J. 599, 612-13 (1989). Reformation is granted to rectify "'either mutual mistake or unilateral mistake by one party and fraud or unconscionable conduct by the other.'" Dugan Constr. Co., 398 N.J. Super. at 242-43 (quoting St. Pius X House of Retreats, Salvatorian Fathers v. Diocese of Camden, 88 N.J. 571, 577 (1982)). "The problem normally arises when the agreement fails to specify correctly the terms that the parties agreed upon[.]" Id. at 243.

"'Reformation presupposes that a valid contract between the parties was created but, for some reason, was not properly reflected in the instrument that memorializes the agreement.'" Lederman v. Prudential Life Ins. Co. of Am., Inc., 385 N.J. Super. 324, 345 (App. Div. 2006) (quoting H. Prang Trucking Co. v. Local Union No. 469, 613 F.2d 1235, 1239 (3d Cir. 1980)). A court will grant reformation only if there is "'clear and convincing proof' that the contract in its reformed, and not original, form is the one that the contracting parties understood and meant it to be." Cent. State Bank v. Hudik-Ross Co., 164 N.J. Super. 317, 323 (App. Div. 1978) (quoting Brodzinsky v. Pulek, 75 N.J. Super. 40, 48 (App. Div. 1962)).

Reformation is not an appropriate remedy here because there are no terms that could be incorporated into a reformed agreement that would meet the expectations of Park Road and AKGG. The parties hold fundamentally mismatched understandings of essential terms of the Agreement where Park Road expects to buy a certain amount of land and AKGG expects to sell less than that amount. Further, there is no evidence that at any point the parties agreed on the amount of land involved in the transaction, thus preventing a mutual mistake of fact worthy of equitable remedy.

We have carefully reviewed the record regarding all remaining arguments and have determined they are without sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

22