**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0178-18T4

JSA SURGICAL FACILITIES,
LLC,

      Plaintiff-Respondent,

v.

CENTER FOR SPECIAL
PROCEDURES, LLC and
DOUGLAS MANGANELLI, M.D.,

      Defendants-Appellants.

_____

SHORE SURGICAL PAVILLION,
LLC,

      Plaintiff-Appellant,

v.

JSA SURGICAL FACILITIES,
LLC and RAVI PONNAPPAN, M.D.,

      Defendants-Respondents.

_____

      Argued telephonically October 8, 2019 – Decided  November 12, 2019

Before Judges Koblitz, Whipple and Mawla.

On appeal from the Superior Court of New Jersey, Chancery Division, Ocean County, Docket Nos. C-000009-17 and C-000120-17.

Terrence John Bolan argued the cause for appellants (Bolan Jahnsen, attorneys; Michelle Lynn Greenberg and Nicole Mary DeWitt, on the briefs).

Vincent T. Cieslik argued the cause for respondents (Capehart & Scatchard PA, attorneys; Vincent T. Cieslik and Mary Ellen Rose, on the brief).

PER CURIAM

Defendants Center for Special Procedures, LLC (CSP), and Shore Surgical Pavilion, LLC (SSP), appeal from the trial court's July 31, 2018 order dismissing plaintiff JSA Surgical Facilities, LLC's (JSA) complaint and defendants' counterclaims with prejudice. The dismissal came after the trial court found two sets of asset purchases agreements (APAs) between the parties unenforceable because there was no meeting of the minds, and because material provisions were too indefinite for the court to enforce. Because the reasons expressed by Judge Francis R. Hodgson, Jr., in his well-reasoned opinion are supported by the trial record, we affirm.

We have discerned the following facts from the record. Douglas Manganelli, M.D., Michael Lepis, M.D., and Allen Morgan, M.D., were the

owners of CSP, a one-room surgical practice registered with the New Jersey Department of Health (DOH). Manganelli and Lepis are also the sole members of SSP, a two-room freestanding ambulatory surgical center licensed by the DOH.

Ravi Ponnappan, M.D., is a surgeon and managing member of JSA. Ponnappan wanted to develop a network of ambulatory surgical centers in New Jersey. However, since New Jersey has a statutory prohibition on the creation of new ambulatory surgical practices, he sought to acquire existing surgical centers.

Ponnappan learned CSP and SSP were for sale and met with Alex Stagliano, the manager of CSP and SSP. Several weeks after he toured the facilities with Stagliano, Ponnappan met with Manganelli and Lepis, and offered to purchase both facilities. A few weeks later the parties met again and Ponnappan orally agreed to purchase CSP for $250,000 and SSP for $1,850,000, for an aggregate purchase price of $2.1 million.

Defendant's counsel, with input from plaintiff's counsel, drafted the first APAs. On June 12, 2016, Ponnappan signed an APA to purchase the assets of CSP for $250,000 and placed $25,000 in escrow to bind the agreement. Ponnappan also signed an APA to purchase the assets of SSP for $1,850,000,

placing $185,000 in escrow to bind the agreement. The line for the closing date in the APAs was blank, so Ponnappan wrote in "as agreed to by the parties[.]" Both of the first APAs, with the added language, were then signed by Manganelli on behalf of defendants. Neither document contained a time of the essence clause, nor any financing contingencies. A condition precedent to the sale was plaintiff's contractual obligation to obtain approval from the DOH for the transfer of the registration and the license.

Defendants, through counsel, later proposed additional housekeeping items and drafted new versions of the agreements, the second APAs, changing the escrow agent, inserting a closing date of September 17, 2016, adding a bill of sale, and requiring a new signed contract. Ponnappan signed the second APAs without noticing the newly-inserted closing date. Later, Ponnappan sent an email asking that his signature be withdrawn because of the closing date. At some point thereafter, Manganelli signed the second APAs.

The parties continued to communicate, but never agreed to a new closing date. During this time, plaintiff was still pursuing bank financing for the purchase, despite the lack of a financing contingency. On December 5, 2016, Manganelli sent letters to plaintiff terminating the APAs for both facilities.

4

On or about January 6, 2017, plaintiff filed a complaint against CSP and Manganelli alleging breach of contract, breach of the covenant of good faith and fair dealing, and tortious interference with prospective economic advantage. Plaintiff also filed an order to show cause seeking to restrain the sale of CSP to third parties, which was denied.

CSP filed an answer and counterclaim in March 2017. Plaintiff then filed an answer to the counterclaim. In the meantime, SSP filed a complaint against JSA alleging breach of contract, breach of the covenant of good faith and fair dealing, misrepresentation, and inducement, and sought declaratory judgment, termination of the APA, release of the deposit monies to SSP, damages, and counsel fees. JSA filed an answer to the complaint, and the trial court consolidated the two pending matters.

Following discovery, Judge Hodgson conducted a seven-day bench trial, after which he dismissed JSA's complaint and CSP's and SSP's counterclaims through an order issued on July 31, 2018, which was supported by a thorough and well-reasoned written decision. He found the handwritten term setting the time for performance upon the future agreement of the parties was too indefinite for the court to enforce. The judge further found the parties labored under a "deep misunderstanding" as to the form and terms of payment, which was an

essential element of the agreement, which indicated the parties did not intend to be bound; there was no meeting of the minds. Ultimately, the court found the first APAs were facially unenforceable.

As to the second APAs, the court found the parties intended them to completely replace the original set of agreements. The court determined the second APAs constituted an attempted novation, which was ineffective because the agreement terminated when plaintiff withdrew its signature before it was signed by defendants, and therefore the documents were never fully executed. Although plaintiff asserted it was ready, willing, and able to close on December 14, 2016, the court found otherwise, since defendants never agreed to the December closing date and plaintiff had not obtained authority to proceed from the DOH as required by the condition precedent.

Finding the contracts were unenforceable, the judge determined there could be no breach of the covenant of good faith and fair dealing. Accordingly, the judge denied all requests for attorneys' fees by the parties. This appeal by defendants followed.

Defendants' essential argument is that the parties' conduct demonstrated a meeting of the minds as to material terms and the court erroneously excused performance by plaintiff, and that the second APAs were an amendment rather

than a new agreement. Defendants also argue they were entitled to retain the escrow funds. We disagree.

We generally defer to factual findings made by a trial judge when such findings are "supported by adequate, substantial, and credible evidence." Gnall v. Gnall, 222 N.J. 414, 428 (2015) (citing Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). Accordingly, we only reverse a trial judge's factual findings when they are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974) (quoting Fagliarone v. Twp. of N. Bergen, 78 N.J. Super. 154, 155 (App. Div. 1963)). In contrast, a "trial judge's legal conclusions, and the application of those conclusions to the facts, are subject to our plenary review." Reese v. Weis, 430 N.J. Super. 552, 568 (App. Div. 2013) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)). With that deferential standard in mind, we turn first to defendants' challenge to the judge's determination there was no enforceable agreement.

Contract law requires "an 'offer and acceptance' by the parties, and the terms of the agreement must 'be sufficiently definite [so] that the performance to be rendered by each party can be ascertained with reasonable certainty.'"

GMAC Mortg., LLC v. Willoughby, 230 N.J. 172, 185 (2017) (quoting Weichert Co. Realtors v. Ryan, 128 N.J. 427, 435 (1992)) (alteration in original). For a contract to be formed, the parties must "agree on essential terms and manifest an intention to be bound by those terms." Weichert, 128 N.J. at 435. However, "[w]here the parties do not agree to one or more essential terms . . . courts generally hold that the agreement is unenforceable." Ibid. "The polestar of contract construction is to discover the intention of the parties as revealed by the language used by them." Karl's Sales & Serv. v. Gimbel Bros., 249 N.J. Super. 487, 492 (App. Div. 1991).

"Generally, the terms of an agreement are to be given their plain and ordinary meaning." M.J. Paquet, Inc. v. N.J. DOT, 171 N.J. 378, 396 (2002) (citation omitted). "[W]here the terms of a contract are clear and unambiguous there is no room for interpretation or construction and the courts must enforce those terms as written." Karl's Sales, 249 N.J. Super. at 493 (citing Kampf v. Franklin Life Ins. Co., 33 N.J. 36, 43 (1960)); see also Cty. of Morris v. Fauver, 153 N.J. 80, 103 (1998).

Courts may not "remake a better contract for the parties than they themselves have seen fit to enter into, or to alter it for the benefit of one party and to the detriment of the other." Karl's Sales, 249 N.J. Super. at 493 (citing

James v. Fed. Ins. Co., 5 N.J. 21, 24 (1950)). "A court has no power to rewrite the contract of the parties by substituting a new or different provision from what is clearly expressed in the instrument." E. Brunswick Sewerage Auth. v. E. Mill Assocs., Inc., 365 N.J. Super. 120, 125 (App. Div. 2004).

Defendants argue the parties were operating toward the same goal, to sell and purchase CSP and SSP, and the conduct of the parties demonstrated a meeting of the minds as to all material aspects of the APAs. They further assert neither party argued at trial the APAs were unenforceable. They argue the court incorrectly analyzed the issue of the closing date and improperly found the language constituted an agreement to contract at a later date, rendering the first set of APAs unenforceable. Defendants assert the closing date was a non-essential issue and the court was permitted by applicable law to impose a reasonable closing date where such terms were ambiguous in the contract.

Based on our review of the record it is clear the primary disputes between the parties related to dates of performance. The judge found, "as a result of the parties 'jumping the gun' and executing contracts that were incomplete, essential terms were handwritten in by [JSA] without sufficient explanation." The judge rightly concluded that while ordinarily where no time for performance is fixed, a reasonable time is prescribed by the court, here the parties agreed to set a

specific date at a later time. Rather than failing to fix a specific date, the parties agreed to determine the date in the future. The court concluded "the handwritten term setting performance upon the future agreement of the parties is too indefinite for [the] [c]ourt to administer and enforce." Moreover, the court found based on

> the indefinite language used in the agreement and the testimony of the parties at trial, . . . the parties themselves . . . left an essential term unresolved. . . . [T]he parties did not come to a meeting of the minds and did not express an intent to be presently bound when executing the agreement.

Additionally, the judge determined the parties "labored under a deep misunderstanding as to an essential element, the form and terms of payment, which further reflects . . . the parties did not intend to be bound." Specifically, the court made detailed findings:

> Here, the terms of payment is an essential element of the contract which goes to the heart of this deal. Although defendants had rejected a mortgage contingency provision, the essence of Dr. Ponnappan's handwritten closing term, effectively extended closing until he obtained financing, which was in effect, to reinsert a mortgage contingency provision. Dr. Ponnappan testified that he did not set a specific date for closing because he wanted to insure he could obtain financing. Conversely, Dr. Manganelli testified that he wanted a quick closing and that he abandoned negotiations with other potential buyers on the representation by Dr. Ponnappan that he could "write a

10

check" to close. However, in light of the importance of this term to defendants, there was insufficient explanation as to why Dr. Manganelli signed the APA[]s which did not include a closing date, if a quick closing was his primary concern. It is the [c]ourt's view that Dr. Manganelli was continuing to rely on the misunderstanding he carried away from the initial meeting in May, that the financial closing would take place quickly without financing and that the lack of direct communication, relying on [Stagliano], exacerbated the initial understanding. While Dr. Ponnappan believed he was not required to close until he obtained third party financing.

Moreover, Dr. Ponnappan's intention to obtain financing was not hidden from defendants. Dr. Ponnappan testified credibly that although he represented he had the capital to close, he always intended to finance the transaction. Dr. Ponnappan's efforts in obtaining financing were repeatedly communicated to the defendants through defendant's agent [Stagliano]: on May 6, 2016, [JSA] emailed [Stagliano] requesting an equipment inventory, indicating that "the bank is asking for a line item breakdown of the purchase. Do you have one avail[able] or can you create a list?" . . .; on May 6, 2016, [Stagliano] replied to Dr. Ponnappan, acknowledging the effort to finance stating that "you'd need one for each center, unless you have one loan covering both centers . . . . Let me know what you find out from the bank." . . . ; on May 9, 2016, Dr. Ponnappan wrote to [Stagliano] where the conversation over financing continued in discussing the inventory and that the "[a]ttorney is actively finalizing purchase agreement . . . . Financing steps underway . . . . Financing will take its course.["]. . . Discussions as to financing continued through December of 2016. On December 1, . . . Dr. Ponnappan wrote [Stagliano]

A-0178-18T4

requesting tax returns for CSP and SSP; twelve hours later, [Stagliano] responded that he was sending the request to the accountant and included two "Request for Transcript of IRS Return" forms signed by Dr. Manganelli. . . . These actions were known by defendants through their agent [Stagliano]. In addition, defendants demonstrated they were aware of [JSA]'s efforts with the action of Dr. Manganelli in executing the APA[]s without a closing date, and sending the executed IRS forms to the accountant, demonstrate at the very least, a passivity as to a quick closing date, which they maintained at trial was the most important term. The [c]ourt is satisfied that these facts demonstrate a profound misunderstanding[] between the parties which sprang from the informality of the process and which was compounded by the parties' apparent lack of direct communication. It is clear to [the] [c]ourt that the parties never came to a meeting of the minds as to the form and timing of payment, which was an essential element of this agreement. In addition to demonstrating a lack of meeting of the minds and intent to be bound, the indefiniteness of the handwritten term would be impossible to enforce.

It was not clear whether Ponnappan would successfully obtain financing and DOH approval, and Manganelli never knew when, if ever, Ponnappan would have been able to close on the transaction. Ultimately, the court concluded the original APAs "do not constitute a meeting of the minds, and further, are unenforceable on their face. Furthermore, the indefiniteness of the handwritten terms was not saved by the second set of APA[]s."

We reject defendants' argument the court was required to establish a reasonable time to close due to the ambiguous term in the agreement. The parties never agreed to a specific closing date and included explicit language that they agreed to enter into another voluntary agreement to establish an appropriate closing date in the future. We discern no error in the judge's determination the handwritten terms as to the closing date were indefinite, rather than ambiguous, and nor do we find the judge erred when he declined to impose a date which would, in effect, rewrite the contract for the parties and eliminate a voluntary agreement to contract as to a to-be-determined closing date.

We also reject defendants' argument that because the parties agreed to sell and purchase the subject properties, established a purchase price, and the buyer performed due diligence on the purchase, all essential elements of the contract were assented to and a meeting of the minds was achieved. As Judge Hodgson chronicled in detail, the parties labored under deep misunderstandings as to how and when the purchase would be financed and never established a closing date. These terms were essential to the agreement. It was the miscommunications between the parties regarding financing and the potential closing dates that eventually caused the negotiations to fall apart.

We further reject defendants' assertion the court erred in not enforcing the specific language agreed to by the parties, and that its opinion had the practical effect of writing a better contract for the buyer. Based on our review, we cannot conclude the court rewrote the agreement—in fact, it explicitly chose not to.

We also reject defendants' argument the parties did not "clearly and definitely" intend a novation. "The elements of a novation are: (1) a previously valid contract; (2) an agreement to make a new contract; (3) a valid new contract; and (4) an intent to extinguish the old contract." Wells Reit II-80 Park Plaza, LLC v. Dir., Div. of Taxation, 414 N.J. Super. 453, 466 (App. Div. 2010) (citing T & N, plc v. Pa. Ins. Guar. Ass'n, 44 F.3d 174, 186 (3d Cir. 1994); In re Timberline Prop. Dev., Inc., 115 B.R. 787, 790 (Bankr. D.N.J. 1990)).

The court found, in pertinent part:

> The provisions of the APA[]s along with the communications and behavior of the parties support the conclusion that the second set of APA[]s were intended to completely replace the original agreements; that is the parties intended a novation. If the parties were only seeking to modify the first APA, all that would have been required under the agreement was a signed provision by the party against whom it was to be enforced.

The parties' communications demonstrated their intent to enter into "superseding agreements" to remedy "housekeeping" issues in the original APAs. The parties

did not execute a signed amendment including the additional terms, but executed a new escrow agreement, bill of sale, and new APAs. The new APAs included an integration clause that the agreements were intended to supersede all prior agreements between the parties pertaining to the transaction. Thus, the court's determination that the second APAs constituted an attempted novation is amply supported by the record. Moreover, the novation failed because the APAs were never fully executed.

We further reject defendants' argument that the court erroneously denied damages where plaintiff failed to diligently pursue DOH approval, in breach of a material term contained in the APAs. Because the parties failed to execute an enforceable contract, there was no breach to warrant an assessment of damages to either party. We also reject the argument that defendants are entitled to funds deposited into the escrow account pursuant to the escrow agreement, and to restitution damages due to the buyer's breach, which defendants argue resulted in loss of economic opportunities.

The escrow agreement provided "the [e]scrow [a]gent shall release the [funds] and deliver [them] to [s]eller upon the occurrence of the following events: (a) upon the [c]losing of the APA; or (b) upon the termination of the APA if the [c]losing does not occur as a result of [p]urchaser's breach of the

APA."  This provision cannot be triggered, as no breach occurred, and the court correctly found each party's claims for damages were moot.  We have carefully reviewed the record regarding all remaining arguments and have determined they are without sufficient merit to warrant discussion in a written opinion.  <u>R.</u> 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0178-18T4